want to play. Thank you. You. So, Mr. Mr. Beckett, yes, Your Honor, Mark Beckett, on behalf of the appellants, the case before you raises a question of whether the district court should have exercised jurisdiction over international human rights claims brought pursuant to the Alien Tort Statute that were directly committed by a natural person who was a citizen of the United States and who moreover used his U.S. residence, U.S. citizenship, and U.S. jurisdiction as a shield and a safe harbor to prevent himself from having to face accountability in life. I'd like you to help me before we get to the merits with the mootness issue. It does seem that that we have suggested that the crime against humanity claim, crimes against humanity claim is a distinct claim with distinct damages, but can you, if you can. I would be helped if you could explain to me really why that's true. The elements of a crime against humanity claim, Judge, involve widespread or systematic attacks on a civilian population using torture, cruel, degrading, and inhumane treatment or arbitrary detention. So, it's distinct. I understand that, too, but in this case, right, would the damages recoverable based on the facts have been different for a plaintiff asserting that claim as opposed to a torture claim? Absolutely, Judge. Absolutely. And why is that? Because the conduct is even more egregious than the torture at issue. The torture here involved... Would not the harm to the plaintiff, though, even though the plaintiff has to prove different things in terms of the element of the claim, would not the harm, though, be the same? It's just not clear to me. I'm just not... No, absolutely, Judge. And I don't know that it's completely clear. It's a jury question at the end of the day, Judge, as to what the jury would think was appropriate in this case, and that's what we found with the award that was given by the jury in this case. Certainly on the question of punitive damages, I think it's easy to see how crimes against humanity would certainly make a very appealing case for an increase in the amount of punitive damages, because here we're talking about... I thought I understood that arbitrary detention was not covered under the Torture Act. Is that correct? That is correct. There were three claims... And that would be covered under the Alien Tort Statute. It would be covered as an international human rights tort brought pursuant to the Alien Tort Statute. So that there was, in fact, no recovery under the Torture Statute for the arbitrary... for the detention. Correct, Judge. And that could be an additional measure of damages, I guess. I assume he was detained for a while. He was arbitrarily detained. That is true. Yes, there were three claims that were dismissed by the District Court's order. One claim for arbitrary detention, one claim for cruel, inhuman, and degrading treatment, and one claim for crimes against humanity. Those were all dismissed, and what we're asking this Court to do is to reinstate those claims, to vacate the District Court's decision dismissing the Alien Tort Statute claims. I think... Does that answer your question, Judge Roberts? It does. Yes. Now, when we get to the rest of the case, I have a concern about whether... It doesn't appear to me that any relevant conduct for purposes of this claim occurred in the United States, and therefore could support a claim that's within the jurisdiction of the Alien Tort Statute. The question before this Court, specifically, is whether this defendant, having used the United States as a safe harbor to avoid accountability in Chile, should be a defendant over whom the District Court exercises jurisdiction. And if you look at this Court's ruling in Doe v. Drummond, what that Court teaches is that the District Court has to look very closely, not just at the claim itself, but at all of the operative facts, all of the relevant conduct. In fact, it says the Court has to look closely at the evidence and the allegations. So it's not merely the bare bones of the claim itself. And it is appellant's position that in this case, this conduct clearly touches and concerns the United States because we have a defendant who is a United States citizen and a natural person. If the citizenship, though, in corporate statuses of the defendants in Doe were insufficient to establish jurisdiction, it's hard for me to see how Barrientos' after-acquired citizenship can support jurisdiction. The facts of this case, Judge, I think demonstrate that the defendant in this case willfully and deliberately avail himself not only of U.S. residency, but of U.S. citizenship in order to evade justice in Chile. And we know that from the facts that have been adduced thus far in the limited discovery we've had. We haven't had discovery on these claims per se, but we've had discovery on the TVPA claims. And what we learned from that is that in 1989, just months after the plebiscite in Chile that indicated that the dictatorship was about to end, Barrientos came to the United States on a visitor's visa, overstayed that visa, was in the United States for an indeterminate period of time, many years with undocumented status, then applied for residency and citizenship. In the course of those applications, Justice— Mr. Trouble, with your argument, it seems to me is what my brother is trying to point out to you. Drummond, at page 592 in the right column, says, Our jurisdictional inquiry requires us to consider the domestic or extraterritorial location where the defendant is alleged to engage in conduct that directly or secondarily results in violations of international law. In other words, the relevant conduct is conduct that either directly or secondarily results in the violations. Here, the violations, the extrajudicial killing and all of the conduct occurred in Chile. None of it occurred in the United States. The connection to the United States came long afterwards. And true, there is no reason why you don't want our country to be a safe haven, but Drummond holds that you've got to have at least some relevant conduct in Chile. And it defines relevant conduct the way I just read, which means there's none in this case. I'm not sure I agree with that reading of Drummond, Your Honor, with all due respect. In fact, I would refer the Court to 586 of the Drummond decision, where it distinguishes the Al-Shomari case, which is a Fourth Circuit case. And it says the Al-Shomari Court first noted that the Court in Kiobel intentionally and broadly stated that the, quote, claims rather than the alleged tortious conduct must touch and concern United States territory with sufficient force. Thus, the Court's operative language instructs lower courts to apply a fact-based analysis to determine whether the ATS claims with a close connection to the U.S. territory displace the presumption. So I think that the Court's looking not solely at the tortious conduct. That's what the district court did. The district court said specifically that it was only looking at tortious conduct. It's looking more broadly than that. And it says near the passage that you just cited, Your Honor, that the Court must closely look at the evidence and the allegations. And what we submit is that you can't just stop at the mere elements of the claim. You can't just stop at what conduct was committed in the other jurisdiction. You have to look at the larger facts here. Look, this is a case, I think we have to maybe also draw back a little bit from all the tests that have been articulated. What we have from Kiobel is really a touch and concern test. It's in one paragraph of the decision. That's all the guidance that we have. And courts have tried to make up their own rules as they go along to figure out how Kiobel should be applied and what it should mean. But if there were ever a case that touched and concerned the interests of the United States, it has to be a case like this one, where someone has purposely availed himself of U.S. citizenship to evade accountability in Chile, and where there is no other remedy that can be had against this defendant. There is no remedy for the horrors in Chile, because there's no trials and abstentia, and there could be no civil damages until the criminal process has run its course, which it can't do because the defendant refuses to go to Chile. I mean, let me just put you back in a time machine for a minute and say that this is 1948, and we have a bunch of former German military officers who are here in the United Would this court really say that having these defendants in the United States unanswerable to any civil claim brought against them by the survivors of the atrocities that were committed, would this court say that it wouldn't exercise its jurisdiction? Under the Alien Tort Statute, we might very well. Well, I would say... I mean, that doesn't mean that Congress can't address the problem otherwise, like it did with respect to the Torture Act, but the Alien Tort Statute is not designed to create a world court for the federal courts. No, that's true, Judge, but the Kiobo Court very specifically said that the Alien Tort Statute was meant to mean something and to have a practical effect, and it elaborated a very narrow rule in that case, and I think you have to read that decision, the Chief of the Court, along with the concurring opinion by Justice Breyer, and along with the opinion by Justice Kennedy, which was very open to other situations. I think you have to go back to the Kiobo test, you have to go back to SOSA, and you have to say, is this a case that implicates U.S. interests, and I don't think you can do that by looking narrowly at the fact that, yes, the conduct itself occurred in another country. The point here is that we have a U.S. citizen who has abused citizenship. Yes, the conduct, all the conduct, not just a majority of the conduct, all the conduct occurred on foreign soil. Well, that's one way of looking at it, Judge, but to be honest with you, from a very practical perspective, when someone comes to the United States to evade justice in their home country, that's part of the continuing cover-up, that's part of the continuing concealment of what was going on. The Hara family has diligently attempted to find the killer of their father for 40 years, and much of it was frustrated because this man concealed his past and lied about it when he applied for citizenship. He specifically failed to state that he had been an officer in the Chilean military, and he specifically said that he was not involved in the violent overthrow of a democratically elected government. It was his conduct itself and his use of his residency in U.S. citizenship that actually frustrated the efforts of this family to find justice at the end of the day. So I would propose to the court that one has to go back and say, is this a case where subject matter jurisdiction should lie? And I submit that it does implicate, in the most core sense, U.S. citizenship. Because here's a gentleman who came to this country and became part of our polity, formed allegiance with us on false grounds in order to evade justice. OK, Mr. Becker, you've saved three minutes for rebuttal. Thank you. Mr. Kynes. Good morning, may it please the court. I'm Leland Kynes. I've been appointed amicus to argue on behalf of affirmance of the district court's ruling. The appellants in this case want you to look back to Caibal and Sosa and ignore the Drummond case. Caibal admittedly left open quite a bit of room, but the Drummond case was a thorough opinion that filled in the bones, the meat, put meat on the bones of Caibal. And in that case. At least for this circuit. That's exactly right. Drummond relied on precedent in Balico, and both of those cases are precedential here. Drummond recognized that there's three different categories of cases under Caibal. And this is footnote 23 of the Drummond decision. If no relevant aspects of an ATS claim occur within the United States, the presumption against extraterritoriality prevents jurisdiction categorically. And I suggest that's the category this case falls into. I suggest that the fact that Mr. Barrientos moved to the United States many years after the underlying act took place is irrelevant to the claim. I understand that the appellants want to focus on the word claim, which they suggest is more expansive than conduct. And I won't argue with that. But here the claim itself took place in Chile, a Chilean victim, a Chilean tortfeasor on Chilean territory. It's clear or it seems clear from the record that Mr. Barrientos wanted to leave Chile to avoid the consequences of his behavior. It's less clear that he came to the United States in order to seek a safe harbor. There's no indication. Obviously, he didn't get a safe harbor. The Torture Victim Protection Act worked, and he was hit with a $28 million judgment against him. There's also an extradition request by Chile. I frankly don't know the status of the extradition request, but there are other remedies available that would prevent the United States from becoming a safe harbor. And I think that's what happened in this case. The second category of cases that Drummond references, and this is the category that the appellants suggest this case falls into, is where some relevant aspects of the claim occur within the United States. And in that situation, that's where this touch and concern focus test that Caiabel and Drummond adopt come into play. And even assuming that the appellants are right that we're in that category, the conduct and the claim simply doesn't touch and concern the United States sufficiently to displace the presumption against extraterritoriality. Again, this case is in many ways just like Drummond. The only distinguishing factor that they can point to is that we have an individual citizen as opposed to a corporate citizen. They argue individual citizens... It's not just like Drummond. It's a whole lot better from your standpoint. I agree because, yes. Because they are winning in Drummond when decisions were made in the United States. That's right. So that there was actually some relevant conduct in the United States that directly or secondarily caused the injury. That's right. That was the case in Drummond. That was the case in Caiabel. That was the case in Balico, where when the tort was committed, some of the actors were in the United States or had some... May have been some kind of funding or policy decision, right? That's right. That's right. The allegation in... And here there's none of that. That's right. So not everything happened in the 70s in Chile. Only many years later did Mr. Barrientos come to the United States. So again, I'll sort of focus on the language of Drummond because Drummond did flesh out the test. Drummond requires, and this is in the second category, Drummond requires that claims must have a U.S. focus and adequate relevant conduct must occur here. Only then is displacement warranted. And then domestic conduct must meet a minimum factual predicate. Even assuming we're in this second category, the conduct here, the domestic conduct, which is the fact he moved here many years later, does not meet that minimum factual predicate. Again, just to touch briefly on Justice Kennedy's concurrence here. Justice Kennedy seemed to suggest in his concurrence, which again is just a concurrence, so it's not binding, that in cases like this one where the Torture Victim Protection Act applies, that we don't even have to deal with these issues. It's a very short concurrence, but he suggested that it was right for the court to leave open this world of possibility, that there may be a case down the road where Kaibel doesn't apply, where the Torture Victim Protection Act doesn't apply, where the ATS, where extraterritorially ATS can apply. This is not that case, I would humbly submit to the court. I'm happy to address the mootness issue, and I will briefly. I certainly don't know as much about the record in the case as the appellant. When I review the complaint, which alleges certain injuries, and I review the jury's verdict, which awarded damages to the estate of Mr. Jara and to his descendants, it seems to me that the injury has been fully redressed. Yeah, what about, though, the fact that we've acknowledged that the Crimes Against Humanity claim, the detention claim, our precedents actually say some different things. We have some precedents suggesting that's a claim, and some that says it's not. But the Crimes Against Humanity claim, we have said, here's a distinct claim, and he says, at the very least, the punitive damages award could be different. That's probably right, isn't it? I concede that that could be right. Now, when I review the record, it doesn't seem to me that they were limited in any way. I don't think there were any motions eliminated that prevented them from addressing all of the conduct alleged in the complaint. So it's my understanding that they got to put on testimony evidence of all of Mr. Barrientos' bad conduct, and then they sought punitive damages on behalf of the estate. And jury might award a different kind of at least punitive damages award where the elements of the claim involve Crimes Against Humanity as opposed to their torture claim, right? That is theoretically possible, and if the court is satisfied with its jurisdiction, I don't have a problem with that. Unless the court has any further questions, I will see the rest of my time. Thank you. Thank you. Mr. Beckett, you have three minutes. Thank you. Just to clear up that last issue, the judge directed, the district judge directed that we take out the ATS claims. There was a third amendment complaint that only included the TVPA claims. So those claims, that complaint was not before the jury, and I would disagree with the characterization that we were allowed to put in all the evidence that we would have put in had we had the Crimes Against Humanity claim. That's not the case. There was other evidence we were planning on presenting that we didn't present as a dismissal. So I think that goes to mootness, which I think we're nearing common ground on in any event. So I won't belabor it. I want to go back to Kiobel for a moment, and I would respectfully submit to this court that this case is much stronger than the Kiobel case. Kiobel case was a case that involved corporations, and Justice Roberts in his decision said that this was mere corporate presence. And I think the implication there is that it would be much different if we were dealing with a natural person where there's exclusivity. I'm forced to his argument, though, Mr. Beckett, that you want to talk about Kiobel, but you don't want to talk about Drummond. No, I'm happy to talk about Drummond, Your Honor. That's to me your biggest problem. I don't read Drummond in the restrictive way that my colleague is presenting it, and perhaps some members of the bench are reading it now. I think that Drummond is susceptible very much to a reading that you look beyond the narrow confines of the elements of the cause of action itself, and that you're permitted to look at all relevant conduct. And to me, all relevant conduct includes what was made out in the complaint and what was certainly made out by the appellants in the course of the briefing on the motion to dismiss when we told the judge this is a safe harbor case. And the judge understood that because in his motion to dismiss, he said, yeah, maybe you've said it's a safe harbor case, but there is no safe harbor now. I don't think he gave an adequate response to that. He's a very learned and enabled judge trying to navigate, I think, somewhat difficult waters here. He said that essentially there wasn't a safe harbor because he had the TVPA claim. So that's not what we say for the reasons that we discussed. Drummond allows this court to go beyond the actual tortious conduct and go back to that passage where it distinguishes Al-Shamari, it reads Al-Shamari, and Al-Shamari says we're not just talking about the tortious conduct, we're talking about all relevant conduct. And the court in Drummond cites Al-Shamari at least a dozen times. So it approves of the reasoning in Al-Shamari ultimately. And that's why it goes on to instruct the district courts that they have to sift carefully. It says look closely at the evidence and the allegations in this case. So this is the pencil line here. I mean, you have to decide, I guess, whether you agree this is relevant conduct or not. We submit to you that a tortious human rights abuser who comes to this country to cloak himself wrongfully, fraudulently with U.S. citizenship to avoid justice where he committed these crimes, does touch and concern. And by the way, the court in Drummond did not ignore the touch and concern test. It embraced the touch and concern test, and that's what we're looking at here. Justice Alito's decision, by the way, in Kiobel, he ordered for a broader rule. It's clear the rest of the court rejected that broader rule, and you have to, I think, look at the concurring opinion of Justice Breyer and of Justice Kennedy. Well, you know, sometime maybe we can talk about Justice Alito's concurring opinion. It has baffled me for a long time. I'm still not sure I understand it, but I'll take your word for it on that. We have your case, Mr. Beckett, and we appreciate your argument. The court will be in recess until tomorrow. All rise. Would you bring all my stuff for me? Thank you.